UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD L. SHEICK, ET AL.,

        Plaintiffs,

v.

AUTOMOTIVE COMPONENT CARRIER,
LLC, ET AL.,

        Defendants.

_____/

Case No. 09-14429

Honorable Nancy G. Edmunds

**OPINION GRANTING PLAINTIFFS' UNOPPOSED MOTION FOR CLASS
CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL [22] AND THE
PARTIES' JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION
SETTLEMENT AGREEMENT AND PROPOSED CLASS NOTICE [23]**

This putative class action comes before the Court on two motions: Plaintiffs'
unopposed motion for class certification and appointment of class counsel [22] and the
parties' joint motion for preliminary approval of class action settlement agreement and
proposed class notice [23]. For the reasons stated below, this Court GRANTS both
motions.

**I.    Plaintiffs' Unopposed Motion for Class Certification and Appointment of
Class Counsel**

    **A. Background**

Plaintiffs Ronald Sheick, Ronald Koenig and Jeri Fulbright are the named Plaintiffs
in this putative class action brought on behalf of former UAW-represented retirees of
Defendant Automotive Component Carrier LLC ("ACC") and others who are covered under

ACC's retiree medical and life insurance benefit plans. Plaintiffs bring this action seeking to remedy alleged violations of collective bargaining agreements ("CBAs") between Defendant ACC and the UAW and alleged violations of a retiree welfare benefit plan created under the CBAs.

In November 2009, ACC notified the UAW that it intended to reduce retiree medical and life insurance benefits. Not long after, Plaintiffs brought this action challenging ACC's announced intention to reduce benefits and seeking declaratory and injunctive relief and damages.[1] Plaintiffs contended, and the UAW agreed, that the retiree benefits had vested under collective bargaining agreements covering ACC's hourly retirees. ACC answered, denying that Plaintiffs had vested, lifetime medical and life insurance benefits. ACC also filed a third-party complaint against the UAW, alleging that the UAW had breached a 2009 agreement respecting the retiree medical and life insurance benefits. The UAW denies this claim by ACC and asserts that ACC has breached the 2009 agreement. During the past seven months, the parties have engaged in intensive negotiations in an effort to resolve these disputes. The negotiations have resulted in a proposed settlement. (*See* Settlement Agreement, Ex. A to Joint Motion.)

This matter is now before the Court on Plaintiffs' unopposed motion, brought pursuant to Federal Rule of Civil Procedure 23, to certify a Plaintiff Class and to have Class Counsel appointed in connection with a proposed settlement.

---

[1] This action was originally brought by Bruce Hecht and Ronald Sheick. On July 12, 2010, the Court entered a stipulated order granting substitution of Plaintiffs Ronald Koenig and Jeri Ann Fulbright for Bruce Hecht.

**B. Analysis**

The proposed Class consists of approximately 325 members and is defined as:

1. ACC/UAW-represented employees who, as of August 1, 2009, are retired from ACC or were terminated from employment with ACC under Option 4 of the Special Attrition Plan set forth in the Memorandum of Understanding between the UAW and ACC (dated May 28, 2009 as amended by addenda dated May 29 and June 2, 2009), with eligibility for Retiree Medical Benefits under the ACC Retiree Life Insurance Plan, and their eligible spouses, surviving spouses and dependents; and

2. surviving spouses and dependents of any ACC/UAW-represented employees who died on or prior to August 1, 2009, under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from the ACC under the ACC Retiree Medical Plan.

(Settlement Agreement, Article I, p. 4.)

**1. Rule 23 Requirements Are Satisfied**

Fed. R. Civ. P. 23 allows plaintiffs to sue of behalf of themselves and a "class" of unnamed individuals who are similarly situated. Retiree benefit cases such as this are frequently certified as class actions. *See, e.g., UAW v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007); *McCoy v. Meridian Auto. Sys., Inc.*, 390 F.3d 417 (6th Cir. 2004).

The proposed Plaintiff Class is defined with sufficient particularity so that there should be no doubt as to whether an individual is a member. The Class definition defines membership largely in terms of meeting certain contractual requirements for benefits. These criteria are derived from collective bargaining agreements between ACC and the UAW, and the parties have identified which individuals are currently eligible to receive benefits under those provisions.

**a. Rule 23(a)**

This action satisfies each of the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy.

First, the class is so numerous as to make joinder impracticable. The proposed Class numbers approximately 325 individuals scattered across several states. The impracticality of joinder is self-evident. Thus, the numerosity requirement is satisfied.

Second, there are significant questions of law and fact common to the Class. The retiree members of the proposed Class were covered by collective bargaining agreements between ACC and the UAW, each of which contained requirements relating to retiree medical benefits for themselves and their spouses, their dependents, and surviving spouses. The First Amended Complaint raises at least two questions common to all members of the Class: (1) whether the UAW-ACC collective bargaining agreements provide vested medical and life insurance benefits, which ACC may not unilaterally reduce; and (2) whether ACC's announced intention to reduce benefits would violate the welfare benefit plan created under the collective bargaining agreements. All Class Members are affected in the same way by these issues. The common question is whether the Class Members' medical and life insurance benefits are vested. The threatened changes challenged by the Class Representatives are all part of the same course of conduct or action by ACC. If the Class Representatives' argument is correct, all proposed Class Members will suffer the same injury – violation of the CBAs and the ACC Plan and the reduction of retiree medical benefits – and all seek the same remedy – a prohibition against ACC's changing the retiree medical benefits or charging a premium for the benefits. Federal courts considering commonality have held that it does not matter that proposed Class Members retired in different years or under different agreements. *See Reese v. CNH*

4

*Am., LLC*, 227 F.R.D. 483 (E.D. Mich. 2005); *see also Mick v. Level Propane Gases, Inc.*, 203 F.R.D. 324, 331 (S.D. Ohio 2001) (certifying class in a contract case and observing that "[t]he existence of different contracts does not, however, preclude relief on class basis when the conduct complained of centers on a common issue . . .").

Third, the Class Representatives' claims are typical of those of the Class. A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory. A representative's claim is typical despite the fact that the evidence relevant to his or her claim varies from other class members, some class members would be subject to different defenses, and the members may have suffered varying levels of injury." *Reese*, 227 F.R.D. at 487-88 (internal citations omitted). Here, there is no doubt that the typicality requirement is satisfied because the named Class Representatives will fare the same as any other Class Member under the Settlement Agreement.

Fourth, the named Class Representatives and their counsel will fairly and adequately represent the interests of the Class. "There are two criteria for determining whether the representation of the class will be adequate: 1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 524-25 (6th Cir. 1976). That Class Representatives and the Class share common interests is addressed under items two and three above. Nothing suggests that there are conflicting or antagonistic interests here. Class Representatives are members of the proposed Class. They represent both retirees and other covered persons. Under the Settlement Agreement, the Class Representatives

5

will not receive any remedy or reward not generally enjoyed by all other Class Members. Moreover, Class Counsel are competent to prosecute this class action and thus satisfy the adequacy requirements of Rules 23(a)(4) and 23(g)(1)(A).

### b. Rule 23(b)(2)

Rule 23 requires that before an action may be maintained as a class action, not only must the prerequisites of Rule 23(a) be met, but the action must also fit into one of the three subdivisions of Rule 23(b). This action also satisfies the standard for class certification under Rule 23(b)(2).

A class action may be maintained under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . ." *Senter*, 532 F.2d at 522 n.23. The requirements of Rule 23(b)(2) are met when "the common claim is susceptible to a single proof and subject to a single injunctive remedy." *Id.* at 525. This action arose because ACC signaled its intent to act on grounds generally applicable to all Class Members by adversely changing the Retiree Medical and Life Insurance Benefits. Moreover, under the proposed Settlement, ACC will take certain actions affecting the proposed Class, e.g., continuing to provide benefits for Class Members over a certain period and funding a VEBA to provide benefits to Class Members thereafter. All of the agreed-upon terms of the proposed Settlement will be generally applicable to the Class.

### 2. Andrew Nickelhoff, Marshall Widick, and their Firm Sachs Waldman, P.C. Are Appointed As Class Counsel

Rule 23(g)(1)(A) requires the Court to consider the following factors when appointing Class Counsel:

(i) "the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class . . . ."

Fed. R. Civ. P. 23(g)(1)(A). Generally, to assure adequate representation, Class Counsel must be qualified, experienced, and capable of conducting the litigation. *Cross v. Nat'l Trust Life Ins. Co.*, 553 F.2d 1026, 1031 (6th Cir. 1977).

Considering the above factors, this Court appoints Andrew Nickelhoff, Marshall Widick, and their firm Sachs Waldman, P.C. as Class Counsel. Lead Plaintiffs' counsel, Andrew Nickelhoff, is experienced in handling union employees and retirees in health care issues, has extensive experience litigating and settling retiree health benefit class actions, and is thoroughly familiar with the applicable law. Mr. Nickelhoff is also familiar with the type of retiree VEBA contemplated in the proposed Settlement Agreement, and he currently serves as legal counsel to two such VEBAs.

### C. Conclusion

For the above-stated reasons, Plaintiffs' unopposed motion for class certification and appointment of Class Counsel is GRANTED.

## II. Joint Motion for Preliminary Approval of Class Action Settlement Agreement and Proposed Class Notice

This matter is currently before the Court on the parties' Joint Motion seeking (1) preliminary approval of the Class Action Settlement Agreement; (2) approval of the proposed class notice and the parties' proposed procedure for distributing the class notice; and (3) an order setting a date for objections to be filed and for a fairness hearing addressing the fairness, reasonableness, and adequacy of the Settlement Agreement. The Court begins with the parties' request for preliminary approval of the Class Action Settlement Agreement.

### A. Preliminary Approval of Class Action Settlement Agreement

The Plaintiffs, Plaintiffs' Counsel, and the UAW, after careful consideration, research and consultation with financial and actuarial professionals, have concluded that the attached Settlement Agreement is in the best interests of the members of the proposed Class. Plaintiffs and the UAW, along with ACC, urge the Court to preliminarily approve the Settlement Agreement.

### 1. Background

ACC is a truckload carrier specializing in delivery of automotive components. It is a wholly-owned subsidiary of Penske Logistics LLC. Before 1996, General Motors provided automotive component delivery to its plants in the Midwest through its North American Operations Transportation Fleet Unit. In 1996, GM spun off that Transportation Unit to ACC. Since then, ACC has been and continues to be substantially dependent on a single customer – GM – for its revenues. In fact, GM accounts for approximately 90% of ACC's revenues. While ACC is, practically speaking, a captive vendor, it potentially competes against local and regional truckload carriers. Anyone with a tractor, a trailer, a driver and

a computer can compete. GM could easily contract with ACC's rivals to procure the same component transport services that ACC provides.

A number of UAW-represented GM employees transferred to ACC when GM spun off its Transportation Unit to ACC. The UAW continued to represent those employees under CBAs with ACC, along with newly hired additions to ACC's workforce. At the time of the acquisition, ACC and the UAW negotiated a Memorandum of Understanding ("MOU") dated September 3, 1996, and later a series of CBAs that obligated ACC to provide the UAW-GM retirees medical and life insurance benefits for UAW-represented ACC employees.

Recognizing that ACC was extending UAW-GM level wages and benefits to its employees, GM agreed to pay ACC a substantial annual "Labor Subsidy" to help ACC cover the difference between market-based wages and benefits and ACC's GM-level wage and benefit cost. The Labor Subsidy approached $25 million per year. A significant component of the GM Labor Subsidy was the additional cost of ACC's collectively bargained retiree medical and life insurance benefits. Since ACC was formed, ACC's retirees have received medical coverage at the unreduced GM benefit level. By contrast, GM retirees have experienced benefit reductions under successive GM-UAW VEBA agreements in 2005, 2007, and 2009. Over those years, ACC retirees have continued to received the unreduced pre-2005 GM medical benefits.

In 2009, GM, in the midst of bankruptcy proceedings, informed ACC that it would no longer pay ACC the Labor Subsidy. Under the 2009 commercial agreement between GM and ACC, effective August 1, 2009, GM discontinued the Labor Subsidy.

As a result, ACC asked the UAW to discuss retiree health and life insurance benefits. ACC represented that without the Labor Subsidy, and given the unavailability of other sources of revenue to replace the Labor Subsidy, ACC could not continue as a financially viable entity in the short or long term without significantly reducing its retiree medical benefit responsibilities. Extensive negotiations between ACC and the UAW, with GM participating, lead to a "Memorandum of Understanding Special Attrition Plan ACC, GM, and UAW," dated May 28, 2009, as revised by Addendums dated May 29, 2009 and June 2, 2009 (collectively, the "2009 MOU"). The 2009 MOU provided that ACC and the UAW would negotiate and establish a voluntary employees' beneficiary association ("VEBA") trust to provide post-retirement health care and life insurance benefits for employees who retired prior to August 1, 2009 and their dependents and surviving spouses, certain non-retirement-eligible employees who terminated employment by August 1, 2009 under Option 4 of a Special Attrition Plan," and surviving spouses of certain employees who died while on disability. In subsequent discussions, ACC proposed an arrangement in which a VEBA would be funded by $7.5 million in cash and $7.5 million in a note from GM. The parties were unable to reach an agreement. In November 2009, ACC stated that it had the right to unilaterally modify and/or discontinue the health care and life insurance benefits of its hourly retirees and announced its intention to do so. The UAW responded that the retiree health care and life insurance benefits were vested and that ACC did not have the right to unilaterally modify or terminate those benefits.

This lawsuit was then filed.

### a. Parties' Claims and Defenses

Plaintiffs filed their Class Action Complaint on November 12, 2009 and a First Amended Complaint on November 13, 2009. Plaintiffs, seeking to represent themselves and all members of the proposed Class, alleged that ACC violated the ACC-UAW collective bargaining agreements and the employee welfare benefit plan created under the CBAs by declaring its intention to reduce or discontinue Plaintiffs' retiree health care program and life insurance benefit. Plaintiffs maintained that the CBAs provided for vested, lifetime benefits for themselves and members of the proposed Class. In their Complaint, Plaintiffs seek declaratory and injunctive relief as well as compensatory and punitive damages. Count I of the Amended Complaint, brought under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, seeks declaratory and injunctive relief and damages for breach of the CBAs. Count II, brought under § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), sought recovery of benefits due, to clarify rights to benefits due under an employee welfare benefit plan, and to remedy an alleged breach of fiduciary duty, as well as attorney fees and other relief.

ACC filed its Answer to the Amended Complaint on November 25, 2009, together with a Third-Party Complaint against the UAW. ACC's Answer denied that ACC breached any contractual obligations to Plaintiffs and the proposed Class Members and denied that the retiree welfare benefits at issue were vested. ACC further denied any obligation under ERISA or the LMRA to provide fully funded retiree health care benefits to Plaintiffs and the Class Members.

ACC's Third-Party Complaint against the UAW alleged that the UAW breached the 2009 MOU by failing to engage in substantive negotiations and by failing to establish the VEBA during the six months after the 2009 MOU was executed. In Count I, brought under 29 U.S.C. § 185, ACC alleged that the UAW breached the 2009 MOU and sought damages. Count II, brought pursuant to 28 U.S.C. § 2201, sought a declaratory judgment that the UAW had breached its obligations under the 2009 MOU and also sought injunctive relief. The UAW denies that it breached the 2009 MOU and asserts that, to the contrary, it was ACC that breached by insisting on terms contrary to that MOU.

### b. The Settlement Negotiations

Before this lawsuit was filed, ACC, the UAW, and GM had engaged in extensive discussions and had exchanged information regarding ACC's financial condition and its ability to compete, and the effect of rising health care and life insurance costs. After this suit was filed, ACC, Plaintiffs' Counsel and the UAW continued the negotiations and discussions in an effort to settle. In-person meetings were supplemented with countless telephone conferences. The discussions finally yielded the Settlement Agreement attached to the Joint Motion.

Plaintiffs' Counsel and the UAW assure the Court that each has undertaken a comprehensive examination and analysis of ACC's financial and business condition in order to independently evaluate ACC's current and probable future ability to provide retiree benefits. ACC has provided Plaintiffs' Counsel and the UAW with extensive information regarding its current and projected future financial and business performance, which the parties discussed in detail. This disclosure included documentation of ACC's financial

performance over a period of years, its dependence on GM for its revenues, and the nature of ACC's market.

Plaintiffs' Counsel and the UAW emphasize that it was vitally important to them to verify ACC's position that after discontinuation of the GM Labor Subsidy and given the unavailability of other sources of revenue to replace the Labor Subsidy, ACC would not be able to continue as a financially viable entity without a restructuring of retiree benefits as described in the Settlement Agreement. Plaintiffs' Counsel and the UAW conducted a thorough analysis of the information requested from and provided by ACC. A UAW analyst reviewed the information provided by ACC regarding its financial condition and its historical expenditures for retiree benefits to the Class Members. Plaintiffs' Counsel retained a financial consultant, Dr. Nitin V. Paranjpe of Thomson Econometrics & Employment Research, a nationally recognized benefits consulting firm, to conduct an investigation and analysis of ACC's financial condition and its current and projected viability, including examination of financial data, commercial arrangements and market position based on information provided by ACC. At the UAW's request, Milliman, Inc., a nationally recognized actuarial expert with special experience working with negotiated VEBA trusts, analyzed the proposed VEBA's projected ability to provide retiree benefits over the long term with the funds available from the Settlement Agreement.

In the course of reaching the proposed settlement, Plaintiffs' Counsel and the UAW each assessed the impact of the proposed settlement on the Class Members, including their continuing access to health care and life insurance. Plaintiffs' Counsel and the UAW gave serious consideration to the documentation indicating that, even if this lawsuit is concluded in favor of Plaintiffs and the Class Members, ACC would not have sufficient

assets to enable it to comply with a judgment. Plaintiffs' Counsel and the UAW also thoroughly investigated and analyzed the various factual and legal issues relevant to Plaintiffs' claims and ACC's claims. They independently reviewed and analyzed the applicable CBAs, conducted their own factual investigations and thoroughly investigated and analyzed the applicable law.

### c. The Settlement Agreement

The material terms of the Settlement Agreement are summarized here. (The entire Settlement Agreement is attached as Ex. A to the Jt. Mot.) The parties have agreed to the creation of a VEBA trust described in Section 4 of the Settlement Agreement to fund a new employee welfare benefit plan (the "New Plan"). The New Plan will be established and administered by the governing Committee of the VEBA trust. Following a transition period, the New Plan and the VEBA will have exclusive responsibility for providing and funding the "Benefits" provided to the Class Members as described in the Trust Agreement.[2] ACC has agreed to provide immediate cash funding for the VEBA. The VEBA will thus be funded from its inception with cash rather than notes, securities, or other obligations.

Class Members are defined above.

The Settlement Agreement incorporates certain modifications to retiree medical benefits effective August 1, 2010 (the "Modified ACC Retiree Medical Plan"). The August 1, 2010 Modified ACC Retiree Medical Plan will provide a program of retiree coverage substantially similar to the reduced benefits provided under the GM VEBA as in effect on January 1, 2010. As of August 1, 2010, dental and vision coverage will be terminated. A

---

[2]Capitalized terms are either defined here or in the Definition Sections of the Settlement Agreement and the form of Trust Agreement (Exs. A and C to Jt. Mot.).

monthly premium co-payment of $15 for single coverage and $30 for family coverage will be required. Class Members will be able to deduct the monthly premiums directly from their pensions. Benefits will be subject to cost-sharing, including annual deductibles ($170 single/$340 family) with annual out-of-pocket maximums, and an in-network 10% co-insurance for medical benefits (30% for out-of-network). The Modified ACC Retiree Medical Plan will remain a Blue Cross Blue Shield of Michigan ("BCBSM") plan, however, it will be self-insured and administered by BCBSM. The provider network is virtually unchanged. Prescription drug coverage will change from CVS/Caremark to BCBSM, and the prescription drug co-payment will be increased from $5 to $10 generic/$25 brand for retail. After the VEBA assumes responsibility for benefits, the VEBA Committee will have the authority and the responsibility to make appropriate changes to the level of benefits, member contributions and cost-sharing, and scope of coverage, as it considers necessary to maintain continued coverage based on actuarial considerations.

The "Current ACC Retiree Life Insurance Plan" as in effect on July 31, 2010, will continue unchanged on and after August 1, 2010, subject to any later changes the VEBA Committee may make in the future to allow for continued benefits under the VEBA.

### d. The VEBA

#### (i) Purpose, Creation, Funding, and Release of ACC

The parties agreed that, effective at the end of 2010, a VEBA would be established, funded by ACC. As of a "New Plan Sponsor Effective Date," the VEBA would become the sponsor of a new retiree medical and life insurance plan (the "New Plan"). Thereafter, the VEBA will be exclusively responsible for providing and funding the New Plan's benefits to the Class Members. The parties agreed that all assets paid or transferred by ACC to the

VEBA (including any investment returns thereon) will be used for the exclusive purposes of providing Retiree Benefits to the participants in the New Plan and their eligible beneficiaries, defraying the reasonable expenses of administering the New Plan and for such other purposes as are set forth in the Trust Agreement. The eligibility rules for the New Plan initially will be the same as those included in the "Modified ACC Retiree Medical Plan" and the "Current ACC Retiree Life Insurance Plan" effective August 1, 2010. The VEBA will be governed by an independent committee (the "VEBA Committee") consisting of four independent members and three members appointed by the UAW.[3] ACC will not be involved in any way in the governance of the VEBA trust, or in the administration of the New Plan after the "Implementation Date." Decisions by the VEBA Committee will require at least one vote from an independent member and one vote from a UAW appointed member.

ACC's financial obligation and payments to the VEBA are fixed and capped by the terms of the Settlement Agreement. ACC will fund the VEBA with a one time "Initial Payment" of $21.6 million. ACC will also make a lump sum "Second Payment" to the VEBA consisting of: (a) interest on the Initial Payment amount from August 1, 2010 until the date of the Initial Payment; plus (b) interest on that amount in "(a)" from the date of the Initial Payment to the date of the Second Payment; plus (c) an amount equal to $300,000, in lieu of any "Medicare Part D" subsidies, temporary "Early Retiree Reinsurance Program" reinsurance (as described in the Patient Protection and Affordable Health Care Act) and other health care related subsidies, rebates and refunds. The Second Payment will be

---

[3]The parties assure the Court that they will file a Trust Agreement exhibit, identifying the Committee members and their compensation, prior to the final approval date.

offset by the sum of certain "Monthly Offset Amounts" defined in Section 6(B)(ii) of the Settlement Agreement.

The payments by ACC to the VEBA are based on the parties' understanding that there are 152 retired/terminated ACC-UAW Represented Employees (or their surviving spouses) currently eligible to receive Retiree Benefits, under the terms of this settlement. In the event that a Class Member, who is a retired or terminated ACC-UAW represented employee or a surviving spouse of such individual (but not a spouse or dependent of such individual) who is not listed on Exhibit D to the Settlement Agreement claims eligibility for Retiree Benefits from either ACC or the VEBA, ACC will pay to the VEBA a lump sum payment of $144,079, adjusted for Interest for the period that begins on August 1, 2010 and ends on the date of payment of such lump sum.

In exchange, ACC will receive a broad release from any liability for providing retiree health care and life insurance benefits, as described in more detail in the Settlement Agreement, §§ 2, 5D, and 14. The only obligations of ACC to the New Plan and the VEBA will be those set forth in the Settlement Agreement.

### (ii)   Negotiation of the ACC VEBA Contribution

The parties' negotiation of the amount of ACC's VEBA contribution was intensive. The goal of Plaintiffs' Counsel and the UAW was to obtain immediate cash funding of the VEBA sufficient to provide substantial medical and life insurance benefits to the Class for the remainder of their lifetimes. Throughout the negotiations regarding the contribution amount, Plaintiffs' Counsel and the UAW drew upon the expertise of their consultants and experts to determine the desired VEBA funding. Plaintiffs' Counsel and the UAW are satisfied that ACC's cash funding commitment is, based on the advice of UAW's actuarial

17

expert, sufficient to satisfy those settlement objectives.  Based on actuarial calculations, ACC's VEBA contributions described above fund 76% of the benefits under the Modified ACC Retiree Medical Plan and the Current ACC Retiree Life Insurance Plan as in effect August 1, 2010.  This funding level means that, unless future experience is more favorable than actuarial assumptions, the VEBA Committee will have to institute benefit reductions and cost-shifting to Class Members after the New Plan Sponsor Effective Date to the extent that it cannot obtain savings through administrative and provider changes.  Despite this, Plaintiffs' Counsel and the UAW believe that the security provided by an independent VEBA trust funded with immediate cash funding is far preferable than subjecting the retirees and their families to the risk of litigation, or the risk that obtaining a favorable judgment will result in a "Pyrrhic victory" if it compromises ACC's continued viability and drives ACC out of business or into bankruptcy.  In this regard, it was extremely important to Plaintiffs' Counsel and the UAW to obtain the security of immediate cash funding in an independent VEBA trust.  The ACC VEBA will not be dependent on funding based on long-term notes or equity instruments of uncertain value, and the VEBA assets will not be subject to the claims of ACC's creditors in the event of ACC's insolvency.  All VEBA trust assets will be used exclusively for payment and administration of benefits to the Class.

### (iii)    Eligibility for the VEBA

Class Members will be eligible to participate in the New Plan and the VEBA. Determinations regarding the status or eligibility of any individual Class Member under the New Plan will be solely and exclusively the responsibility of the VEBA Committee.  A Class Member will be eligible for participation in the New Plan and the VEBA and to receive benefits from the VEBA trust with respect to claims incurred on and after the "New Plan

18

Sponsor Effective Date."  Participation in the New Plan may be contingent on the Class Member's satisfying conditions the VEBA Committee may impose.

**(iv)    Provision of Benefits During Transition**

Because of the time necessary to complete the settlement approval process, to create the VEBA, and get the VEBA up and running so as to provide a smooth transition in coverage for Class Members, the parties agreed that ACC would have to continue to act as the plan sponsor and administer Retiree Benefits for a period of time.  Through July 31, 2010, ACC will continue, as the plan sponsor, to provide the Class Members with the "Retiree Medical Benefits" and "Retiree Life Insurance Benefits" that they currently have.

Beginning on August 1, 2010 and until the New Plan Sponsor Effective Date, ACC will provide the Class with Retiree Medical Benefits as set forth in the "Modified ACC Retiree Medical Plan" and will continue to provide the Class with Retiree Life Insurance Benefits at the same level and scope as provided by the Current ACC Retiree Life Insurance Plan.

With respect to claims incurred on or after the New Plan Sponsor Effective Date, but prior to the Implementation Date, the New Plan and the VEBA will have responsibility for providing Benefits for the Class.  ACC and the "Penske Entities," however, will provide transitional administrative assistance to the New Plan and the VEBA as a third-party administrator in accordance with Section 5(b) of the Settlement Agreement.  This is designed to ensure no interruption in Benefits if ACC is unable to perform that function.

As of the Implementation Date, the New Plan and the VEBA will provide and administer Benefits for the Class.  ACC will no longer have any obligations or responsibilities as a third-party administrator for the New Plan, and ACC will no longer

19

participate in any manner in the administration of the New Plan and the VEBA. Accordingly, after the Implementation Date, administration of the New Plan and the VEBA will be solely the responsibility of the VEBA Committee. The VEBA Committee will have the authority to establish benefits as described in the Trust Agreement, including raising or lowering benefits, as of the New Plan Sponsor Effective Date.

ACC and the "Penske Entities" have agreed in the Settlement Agreement to cooperate fully with Plaintiffs' Counsel, the UAW, and the VEBA Committee, in the transition of administration of Retiree Benefits to the VEBA Committee and the New Plan.

### (v)     Costs, Expenses, and Attorney Fees

Plaintiffs' Counsel will apply to the Court for reimbursement by ACC of reasonable attorney fees, expert and professional fees and expenses. As part of the Settlement Agreement, ACC has agreed to pay these fees as approved by the Court.

ACC has also agreed to pay the UAW's legal fees in the fixed amount of $60,000. Further, ACC agreed to pay reasonable and necessary expert and consultant fees and expenses incurred by Plaintiffs' Counsel and the UAW's Counsel. Finally, ACC agreed to pay reasonable and necessary implementation and transition expenses associated with the New Plan and the VEBA.

Consequently, ACC's contribution to the VEBA can be used to provide benefits to the Class Members going forward and will not be consumed with implementation and transition expenses or expenses or professional fees associated with litigation or the settlement.

ACC has agreed not to seek fees or expenses.

## 2. Analysis

The Court's role in reviewing class action settlements "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers*, 803 F.2d 878, 880 (6th Cir. 1986) (*per curiam*) (internal quotation marks and citation omitted). To assess the fairness, adequacy and reasonableness of a class action settlement, the Court considers the following factors:

> (a) the likelihood of success on the merits weighed against the amount and form of the relief offered in the settlement; (b) the risks, expense, and delay of further litigation; (c) the judgment of experienced counsel who have competently evaluated the strength of their proofs; (d) the amount of discovery completed and the character of the evidence uncovered; (e) whether the settlement is fair to the unnamed class members; (f) objections raised by class members; (g) whether the settlement is the product of arm's length negotiations as opposed to collusive bargaining; and (h) whether the settlement is consistent with the public interest.

*In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 522 (E.D. Mich. 2003) (citations omitted).

Review and approval of class settlements involves a two-step process: (1) preliminary approval of the settlement and the content and method of class notice; and (2) final approval after notice and a fairness hearing. *See Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982). This matter is before the Court at the first step in the process where the Court "ascertain[s] whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Id.* In this regard, the Settlement Agreement should be preliminarily approved if it (1) "does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment to

class representatives or of segments of the class, or excessive compensation for attorneys," and (2) "appears to fall within the range of possible approval." *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 350 (N.D. Ohio 2001).

Because the Settlement Agreement provides Class Members a benefit within the range of possible approval, was negotiated at arm's length, and does not evidence unduly preferential treatment or other obvious deficiencies, it satisfies the requirements for preliminary approval.

### a. The Settlement Agreement is Fair, Reasonable, and Adequate

Considering the parties' vigorously-contested legal and factual disputes, the risks, uncertainties, hardships, and delays inherent in continued litigation, and the substantial settlement amount and its salutary and beneficial impact, the settlement terms clearly fall within the range of reasonableness contemplated by Rule 23(e). As the Sixth Circuit recently observed, the delay and risk inherent in retiree health benefits class actions make these cases "particularly" appropriate for settlement "through negotiation today rather than litigation tomorrow." *UAW v. Gen. Mtrs. Corp.*, 497 F.3d 615, 632 (6th Cir. 2007).

Plaintiffs and the UAW believe that the retiree health care and life insurance benefits at issue are vested and may not be modified unilaterally as ACC seeks to do. ACC disputes that the benefits are vested, asserting that it has the clear right to modify the benefits. All parties, though confident in their legal positions, recognize the uncertainties of litigation, and that the prospect of "a long, arduous [trial] requiring great expenditures of time and money on behalf of both the parties and the court" weighs in favor of settlement. *In re Cincinnati Policing*, 209 F.R.D. 395, 400 (S.D. Ohio 2002) (internal quotation marks and citation omitted).

Reviewing the terms of the Settlement Agreement, it appears to provide all sides with beneficial certainty and prompt resolution. Moreover, the settlement terms are the product of an informed and reasoned process in which all sides vigorously pressed their interests and, ultimately, developed a mutually-beneficial compromise. The decisive factors in favor of settlement include: (1) ACC's commercial and financial position, and specifically its short and long term ability to continue paying for retiree medical and life insurance benefits; and (2) that, under the proposed settlement, the retirees will be protected from that risk by immediate and substantial cash funding of an independent VEBA trust.

Plaintiffs' Counsel and the UAW have carefully considered the prospect that, regardless of the legal strength of Plaintiffs' claims, a successful outcome will do little good for the Class if ACC is financially unable to comply with a judgment for the Class. Based on their review of the information, and on the examination and conclusions of their experts, Plaintiffs' Counsel and the UAW are convinced that ACC can exert little to no market leverage to induce GM to continue the Labor Subsidy and that without the Labor Subsidy or any available replacement, ACC will not continue as a financially viable entity without restructuring and reduction of its retiree benefit obligation. Balanced against that, Plaintiffs' Counsel and the UAW believe the proposed settlement will provide secure funding and thereby protect the retirees' benefits. The Settlement Agreement provides coverage for all eligible retirees. The immediate VEBA cash funding alleviates the risk that would result if continuation of the Class Members' retiree health care and life insurance benefits were to remain dependent on ACC's financial fortunes over the short or the long term. Under the proposed settlement, the money to provide benefits in the future will be placed in the VEBA

trust now, protected from the claims of ACC or its creditors, where it will be administered for the exclusive benefit of the Class Members.

### b. Arm's-Length Negotiations, Fairness to Unnamed Class Members

Here, negotiations of the Settlement Agreement were conducted at arm's-length by adversarial parties and experienced counsel, which itself is indicative of fairness, reasonableness, and adequacy. First, the UAW has a long history of negotiating on behalf of ACC employees. The UAW is thus well positioned to analyze the parties' rights under the various CBAs and plan documents. The UAW and ACC began discussing the Retiree Benefits almost a year ago. Shortly after this action was filed, Plaintiffs' Counsel joined the discussions between ACC and the UAW. It was only after seven months of additional marathon, hard-fought discussions and negotiations that the parties were able to forge a compromise.

Second, ACC has provided Plaintiffs' Counsel and the UAW with financial information and relevant documents that they have requested. The UAW has reviewed the governing documents, the information provided by ACC, and the relevant law. Plaintiffs' Counsel has undertaken the same review and analysis with the assistance of its expert consultant. Both Plaintiffs' Counsel and the UAW's counsel are experienced in this type of litigation and have extensive experience with VEBAs. After this review, Plaintiffs' Counsel and the UAW have concluded that settlement is in the best interests of the Class. Plaintiffs' Counsel's informed and reasoned judgment and their weighing of the relative risks and benefits of protracted litigation are entitled to deference. *See Hughes v. Microsoft Corp.*, No. C98-1646C, 2001 WL 34089697, at *7 (W.D. Wash. Mar. 26, 2001) (observing that "plaintiffs' counsel's opinion is accorded considerable weight").

Third, the Class is cohesive and relatively homogeneous, and the Settlement Agreement thus affects similarly-situated Class Members in the same fashion. Because all Class Members share the same interests in obtaining the best possible benefits for retirees, there is no risk of unequal treatment of absent Class Members or preference to Plaintiffs as the class representatives. The named Plaintiffs will receive exactly the same benefits as other similarly-situated Class Members. They will receive nothing extra or different on account of their service as Class Representatives, and the absence of favored treatment refutes any suggestion of collusion. *See, e.g., Heit v. Van Ochten*, 126 F. Supp.2d 487, 490-91 (W.D. Mich. 2001).

Fourth, further evidence of fairness derives from the fact that the Settlement Agreement does not provide for excessive attorney fees. The reasonableness of attorney compensation is ultimately in the Court's control and is to be paid by ACC; not out of Class funds. The Agreement expressly provides that Plaintiffs' Counsel will apply to the Court for reimbursement by ACC of reasonable attorney fees based upon the hours actually worked and a reasonable hourly rate and with no upward adjustments (such as lodestar multipliers, risk enhancements, success fee, completion bonus, or rate premiums). (*See* Ex. A, Settlement Agreement at § 13.)

Considering the above, the Court preliminarily approves the Settlement Agreement as fair, reasonable, and adequate because it provides significant benefits to the Class Members and reflects the parties' informed judgment as to the risks and likely benefits of litigation.

The Court now considers the parties' request for approval of the content and method of providing notice to the Class.

## B. The Content and Method of Parties' Proposed Notice is Approved

The Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). The notice "should be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objection." *UAW v. Gen. Mtrs. Corp.*, 497 F.3d 615, 629-30 (6th Cir. 2007) (internal quotations and citations omitted).

The parties have agreed to a proposed form of class settlement notice to be mailed directly to households of Class Members by ACC's Counsel and a form of class settlement notice for publication in Michigan. (*See* Exs. B-1 and B-2, respectively.) ACC's Counsel has compiled a reasonably current list of all Class Members and a list of addresses for all eligible retirees/terminated employees and the eligible surviving spouses. ACC does not have separate address information for the eligible spouses and dependents of retired/terminated employees who are eligible to receive benefits. This Court agrees with ACC that sending notice to the household of each eligible retiree/terminated employee and surviving spouse, together with notice in publications of general circulation in Michigan, will provide reasonable and sufficient notice to all Class Members, including eligible spouses and dependents.

The Proposed Notices set out the material terms of the proposed settlement and satisfy Rule 23 and due process requirements. They explain the nature of the controversy, the details of the Settlement Agreement, the eligibility of Class Members to participate in the settlement, the rights of Class Members to object and (provided they timely submit an objection to the Court) to appear and be heard at the Fairness Hearing required under Fed. R. Civ. P. 23(e)(2). The Settlement Agreement, the Trust Agreement, and a document

summarizing important features of the Modified ACC Retiree Medical Plan will accompany the notice to be mailed to Class Members.

ACC assures the Court that it will use its best efforts to send notices to Class Members by first class mail, as required by Fed. R. Civ. P. 23(e)(1), in substantially the same form set forth in Exhibit B-1 by **August 3, 2010**. ACC will also provide notice by publication in the Detroit Free Press and the Detroit News on or before **August 4, 2010** in substantially the same form set forth in Exhibit B-2.

The notice by mail and notice by publication inform Class Members that Written Objections to be submitted by **September 3, 2010**, and the Fairness Hearing is set for **September 16, 2010** @ 2 p.m.

In light of the above, the Court approves the content and method of proposed notice to the Class.

### C. Conclusion

For the above-stated reasons, the Joint Motion for Preliminary Approval of Class Action Settlement Agreement and Proposed Class Notice is GRANTED.

## III. Conclusion

Plaintiffs' unopposed motion for class certification and appointment of class counsel

[22] and the parties' joint motion for preliminary approval of class action settlement agreement and proposed class notice [23] are GRANTED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: August 2, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 2, 2010, by electronic and/or ordinary mail.

s/Karen M. Hillebrand
Case Manager