IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD L. SHEICK, RONALD KOENIG, and
JERI ANN FULBRIGHT on behalf of themselves
and a similarly situated class,

                    Plaintiffs,

     v.

AUTOMOTIVE COMPONENT CARRIER LLC,
formerly doing business as
AUTOMOTIVE COMPONENT CARRIER, INC.,

                    Defendants.

AUTOMOTIVE COMPONENT CARRIER LLC,

                Third-Party Plaintiff,
     v.

INTERNATIONAL UNION,
UNITED AUTOMOBILE AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA (UAW).
                Third-Party Defendant.
_____/

Case No. 2:09-cv-14429
Hon. Nancy G. Edmunds
Magistrate Mona K. Majzoub

**OPINION AND ORDER GRANTING JOINT MOTION FOR APPROVAL OF CLASS
ACTION SETTLEMENT [34]**

On September 10, 2010, Plaintiffs and Class representatives Ronald L. Sheick, Ronald

Koenig and Jeri Ann Fulbright (collectively "Plaintiffs"), as individuals and on behalf of a

certified Class of themselves and all persons similarly situated, and Defendant and Third-Party

Plaintiff Automotive Component Carrier LLC, formerly d/b/a Automotive Component Carrier,

Inc. ("ACC"), and Third-Party Defendant International Union, United Automobile Aerospace

and Agricultural Implement Workers of America (the "UAW"), jointly moved for approval of

the parties' Settlement Agreement to fully and finally resolve this class action.  (Doc. 34.)

The Court preliminarily approved the Settlement Agreement on August 2, 2010, and approved a notice to class members by mail and by publication in Michigan, which described the settlement, set an objection deadline, and set forth the date for the fairness hearing. The notice and settlement documents were sent to the class members by mail on August 3, 2010 and the notice was published in the Detroit News and the Detroit Free Press on August 4, 2010. In addition, on July 19, 2010, ACC's counsel fulfilled the requirements of the Class Action Fairness Act of 2005, 28 U.S.C. § 1711, *et. seq.* ("CAFA"), by serving notice of the proposed class action settlement and related documents upon the Attorney General of the United States and the Attorneys General of each state where a Class Member resides (the "CAFA Notice"). The Court conducted a fairness hearing on September 16, 2010. Based on the hearing and on submissions to the Court, the Court makes the following findings of fact and conclusions of law, GRANTS the parties' joint motion for final approval, and approves the parties' settlement resolving this class action.

## I.  FINDINGS OF FACT

This class action addresses ACC's announced intention to modify medical and life insurance benefits provided to retirees formerly represented by the UAW and their covered spouses, dependents and surviving spouses.

### A.  The Parties and the Class

The individual plaintiffs and class representatives are Ronald Scheick, Ronald Koenig and Jeri Ann Fulbright.

The Defendant and Third-Party Plaintiff is Automotive Component Carrier LLC, formerly d/b/a Automotive Component Carrier, Inc. ("ACC").

The Third-Party Defendant is the International Union, United Automobile Aerospace and Agricultural Implement Workers of America (the "UAW").

The Court certified the class, approved the individual plaintiffs as class representatives, approved class counsel and preliminarily approved the parties' settlement on August 2, 2010. (Prelim. Approval Op., Doc. 27; Prelim. Approval Order, Doc. 28; Approved Class Notice, Doc. 29.) The certified class (the "Class") consists of approximately 324 members (the "Class Members") and is defined as:

> (1) ACC-UAW Represented Employees who, as of August 1, 2009, were retired from ACC or were terminated from employment with ACC under Option 4 of the Special Attrition Plan set forth in the Special Attrition Plan ACC, GM and UAW dated May 28, 2009, as amended by Addenda dated May 29, 2009 and June 2, 2009, with eligibility for Retiree Medical Benefits under the ACC Retiree Medical Plan and/or Retiree Life Insurance Benefits under the ACC Retiree Life Insurance Plan, and their eligible spouses, surviving spouses and dependents; and

> (2) surviving spouses and dependents of any ACC-UAW Represented Employees who died on or prior to August 1, 2009 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from ACC under the ACC Retiree Medical Plan.

(Settlement Agreement, Doc. 23 Ex. A, Article I, pg. 4; Prelim. Approval Op., Doc. 27 pg. 3; Prelim. Approval Order, Doc. 28 pg. 2.)

### B.  Background

ACC is a truckload carrier specializing in delivery of automotive components. (Decl. of Paul F. Ott, Doc. 23 Ex. C ¶ 3.) It is a wholly-owned subsidiary of Penske Logistics LLC. (*Id.* ¶ 13.) Before 1996, General Motors ("GM") provided automotive component delivery to its plants in the Midwest through its North American Operations Transportation Fleet Unit. In 1996, GM spun off that Transportation Unit to ACC. Since then, ACC has been and continues to be substantially dependent on a single customer – GM – for its revenues. (Ott Decl., Dec. 23 Ex. C ¶ 5; Decl. of Nitin V. Paranjpe, Doc. 23 Ex. D ¶ 9, Chart B.)

GM accounts for approximately 90% of ACC's revenues. (*Id.*) While ACC is, practically speaking, a captive vendor, it potentially competes against local and regional truckload carriers.

Anyone with a tractor, a trailer, a driver and a computer can compete. GM could easily contract with ACC's rivals to procure the same component transport services that ACC provides. (Ott Decl., Doc. 23 Ex. C ¶ 6.)

A number of UAW-represented GM employees transferred to ACC when GM spun off its Transportation Unit to ACC. The UAW continued to represent those employees under collective bargaining agreements ("CBAs") with ACC, along with newly hired additions to ACC's workforce. At the time of the acquisition, ACC and the UAW negotiated a Memorandum of Understanding ("MOU") dated September 3, 1996, and later a series of CBAs that obligated ACC to provide the UAW-represented ACC employees with medical and life insurance benefits identical to those provided to UAW-GM retirees. (Prelim. Approval Br., Doc. 23 pp. 3-4; Prelim. Approval Op., Doc. 27 pg. 9.)

Recognizing that ACC was extending UAW-GM level wages and benefits to its employees, GM agreed to pay ACC a substantial annual "Labor Subsidy" to help ACC cover the difference between market-based wages and benefits and ACC's GM-level wage and benefit cost. (Ott Decl., Doc. 23 Ex. C ¶ 8; Paranjpe Decl., Doc. 23 Ex. D ¶ 8, Chart A.) The Labor Subsidy approached $25 million per year. (Paranjpe Decl., Ex. D ¶ 8.) A significant component of the GM Labor Subsidy was the additional cost of ACC's collectively bargained retiree medical and life insurance benefits.

Since ACC was formed, ACC's retirees have received medical coverage at the unreduced GM benefit level. By contrast, GM retirees have experienced benefit reductions under successive GM-UAW VEBA agreements in 2005, 2007, and 2009. Over those years, ACC retirees have continued to receive the unreduced pre-2005 GM medical benefits. (Prelim. Approval Br., Doc. 23 pg. 4; Prelim. Approval Op. Doc. 27 pg. 9.)

In 2009, GM, in the midst of bankruptcy proceedings, informed ACC that it would no longer pay ACC the Labor Subsidy. Under the 2009 commercial agreement between GM and ACC, effective August 1, 2009, GM discontinued the Labor Subsidy. (Ott Decl., Doc. 23 Ex. C ¶ 9.)

As a result, ACC asked the UAW to discuss retiree medical and life insurance benefits. ACC represented that without the Labor Subsidy, ACC could not continue as a financially viable entity in the short or long term without significantly reducing its retiree benefit responsibilities. Extensive negotiations between ACC and the UAW, with GM participating, lead to a "Memorandum of Understanding Special Attrition Plan ACC, GM, and UAW," dated May 28, 2009, as revised by Addendums dated May 29, 2009 and June 2, 2009 (collectively, the "2009 MOU"). (Prelim. Approval Br., Doc. 23 pp. 4-5; Prelim. Approval Op. Doc. 27 pg. 10.) The 2009 MOU provided that ACC and the UAW would negotiate and establish a voluntary employee's beneficiary association ("VEBA") trust to provide post-retirement medical and life insurance benefits for employees who retired prior to August 1, 2009 and their dependents and surviving spouses, certain non-retirement-eligible employees who terminated employment by August 1, 2009 under Option 4 of a "Special Attrition Plan," and surviving spouses of certain employees who died while on disability. (*Id.*) In subsequent discussions, ACC proposed an arrangement in which a VEBA would be funded by $7.5 million in cash and $7.5 million in a note from GM. (*Id.*) The parties were unable to reach an agreement.

In November 2009, ACC stated that it had the right to unilaterally modify and/or discontinue the medical and life insurance benefits of its hourly retirees and announced its intention to do so. The UAW responded that the retiree medical and life insurance benefits were

vested and that ACC did not have the right to unilaterally modify or terminate those benefits. This lawsuit followed.

### C.    The Parties Claims and Defenses

Plaintiffs filed their Class Action Complaint on November 12, 2009 (Doc. 1) and a First Amended Complaint on November 13, 2009.  (Doc. 3.)  Plaintiffs filed their Second Amended Class Action Complaint on July 20, 2010.  (Doc. 24.)

Plaintiffs, seeking to represent themselves and all members of the proposed Class, alleged that ACC violated the ACC-UAW collective bargaining agreements and employee welfare benefit plan created under the CBAs by declaring its intention to reduce or discontinue Plaintiffs' retiree medical and life insurance benefits.  Plaintiffs maintained that the CBAs provided for vested, lifetime benefits for themselves and members of the proposed Class.

In their Complaint, Plaintiffs seek declaratory and injunctive relief as well as compensatory and punitive damages.  Count I of the Amended Complaint, brought under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, seeks declaratory and injunctive relief and damages for breach of the CBAs.  Count II, brought under § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), sought recovery of benefits due, to clarify rights to benefits due under an employee welfare benefit plan, and to remedy an alleged breach of fiduciary duty, as well as attorney fees and other relief.

ACC filed its Answer to the Amended Complaint on November 25, 2009, together with a Third-Party Complaint against the UAW.  (Docs. 10 and 11, respectively.)  ACC's Answer denied that ACC breached any contractual obligations to Plaintiffs and the proposed Class

Members and denied that the retiree welfare benefits at issue were vested.  ACC further denied any obligation under ERISA or the LMRA to provide fully funded retiree medical benefits to Plaintiffs and the Class Members.

ACC's Third-Party Complaint against the UAW alleged that the UAW breached the 2009 MOU by failing to engage in substantive negotiations and by failing to establish the VEBA during the six months after the 2009 MOU was executed.  In Count I, brought under 29 U.S.C. § 185, ACC alleged that the UAW breached the 2009 MOU and sought damages.  Count II, brought pursuant to 28 U.S.C. § 2201, sought a declaratory judgment that the UAW had breached its obligations under the 2009 MOU and also sought injunctive relief.  The UAW denies that it breached the 2009 MOU and asserts that, to the contrary, it was ACC that breached by insisting on terms contrary to the MOU.

### D.    The Settlement

Because the stakes are high and the litigation risks and uncertainties for all parties and the Class are great, the parties engaged in settlement negotiations and exchanged information. Ultimately, the parties reached the mutually-acceptable compromise memorialized in the Settlement Agreement.  (Settlement Agreement, Doc. 23 Ex. A.)  As described in more detail below, settlement funds paid by ACC will be used to form and fund a VEBA to provide retiree medical and life insurance benefits for class members into the future.

#### 1.    The Settlement Negotiations

Before this lawsuit was filed, ACC, the UAW and GM had engaged in extensive discussions and had exchanged information regarding ACC's financial condition and its ability to compete, and the effect of rising health care and life insurance costs.  After this suit was filed,

ACC, Class Counsel and the UAW continued the negotiations and discussions in an effort to settle. In-person meetings were supplemented with countless telephone conferences. The discussions finally yielded the Settlement Agreement.

Class Counsel and the UAW assure the Court that each has undertaken a comprehensive examination and analysis of ACC's financial and business condition in order to independently evaluate ACC's current and probable future ability to provide retiree benefits. (Prelim. Approval Br., Doc. 23 pg. 7; Prelim. Approval Op. Doc. 27 pg. 12.) ACC has provided Class Counsel and the UAW with extensive information regarding its current and projected future financial and business performance, which the parties discussed in detail. (*See* Ott Decl., Doc. 23 Ex. C ¶¶ 10-11; Paranjpe Decl., Doc. 23 Ex. D ¶ 5.) ACC's disclosures included documentation of ACC's financial performance over a period of years, its dependence on GM for its revenues, information about its retiree benefits and related expenses and the nature of ACC's market. (*Id.)*

Class Counsel and the UAW emphasize that it was vitally important to them to verify ACC's position that -- after discontinuation of the GM Labor Subsidy and given the unavailability of other sources of revenue to replace the Labor Subsidy -- ACC would not be able to continue as a financially viable entity without a restructuring of retiree benefits as described in the Settlement Agreement. (Prelim. Approval Br., Doc. 23 pp. 7-8; Prelim. Approval Op. Doc. 27 pg. 13.) Class Counsel and the UAW conducted a thorough analysis of the information requested from and provided by ACC. (*Id.)* A UAW analyst reviewed the information provided by ACC regarding its financial condition and its historical expenditures for retiree benefits to the Class Members. (*Id.)* Class Counsel retained a financial consultant, Dr. Nitin V. Paranjpe of Thomson Econometrics & Employment Research, a nationally recognized benefits consulting firm, to conduct an investigation and analysis of ACC's financial condition and its current and

projected viability, including examination of financial data, commercial arrangements and market position based on information provided by ACC. (Paranjpe Decl., Doc. 23 Ex. D.) At the UAW's request, Milliman, Inc., a nationally recognized actuarial expert with specific experience working with negotiated VEBA trusts, analyzed the proposed VEBA's projected ability to provide retiree benefits over the long term with the funds available from the Settlement Agreement. (Taranto Decl., Doc. 23 Ex. E.)

In the course of reaching the proposed settlement, Class Counsel and the UAW each assessed the impact of the proposed settlement on the Class Members, including their continuing access to health care and life insurance. (Prelim. Approval Br., Doc. 23 pp. 8-9; Prelim. Approval Op. Doc. 27 pg. 13-14.) Class Counsel and the UAW gave serious consideration to the documentation indicating that, even if this lawsuit is concluded in favor of Plaintiffs and the Class Members, ACC would not have sufficient assets to enable it to comply with a judgment. (*Id.*) Class Counsel and the UAW also thoroughly investigated and analyzed the various factual and legal issues relevant to Plaintiffs' claims and ACC's claims. (*Id.*) They independently reviewed and analyzed the applicable CBAs, conducted their own factual investigations and thoroughly investigated and analyzed the applicable law. (*Id.*)

### 2.    The Settlement Agreement

The material terms of the Settlement Agreement are summarized here. (*See also* Settlement Agreement, Doc. 23 Ex. A.)

The parties have agreed to the creation of a VEBA trust described in Section 4 of the Settlement Agreement to fund a new employee welfare benefit plan (the "New Plan"). The New Plan will be established and administered by the governing Committee of the VEBA trust.

Following a transition period, the New Plan and the VEBA will have exclusive responsibility for providing and funding the "Benefits" provided to the Class Members as described in the Trust Agreement.[1] The Trust Agreement is attached to the Settlement Agreement as Ex. C.[2] (Doc. 23, Ex. A at Ex. C.) ACC has agreed to provide immediate cash funding for the VEBA. The VEBA will thus be funded from its inception with cash rather than notes, securities or other obligations.

The Class and the Class Members are defined above.

The Settlement Agreement incorporates certain modifications to retiree medical benefits effective August 1, 2010 (the "Modified ACC Retiree Medical Plan"). The August 1, 2010 Modified ACC Retiree Medical Plan will provide a program of retiree coverage substantially similar to the reduced benefits provided under the GM VEBA as in effect on January 1, 2010. As of August 1, 2010, dental and vision coverage will be terminated. A monthly premium co-payment of $15 for single coverage and $30 for family coverage will be required. Class Members will be able to deduct the monthly premiums directly from their pensions. Benefits will be subject to cost-sharing, including annual deductibles ($170 single/$340 family) with annual out-of-pocket maximums, and an in-network 10% co-insurance for medical benefits (30% for out-of-network). The Modified ACC Retiree Medical Plan will remain a Blue Cross Blue Shield of Michigan ("BCBSM") plan, however, it will be self-insured and administered by BCBSM. The provider network is virtually unchanged. Prescription drug coverage will change

---

[1]     Capitalized terms are either defined here or in the Definition Sections of the Settlement Agreement and the form of Trust Agreement. (Settlement Agreement, Doc. 23 Ex. A Article I; Trust Agreement, Doc. 23 Ex A at Ex. C, Article I).

[2]     A Notice designating the initial independent members of the VEBA Committee, their initial terms and their initial compensation has been filed with the Court, along with a revised Trust Agreement. (*See* ¶ 32.)

from CVS/Caremark to BCBSM, and the prescription drug co-payment will be increased from $5 to $10 generic/$25 brand for retail.

After the VEBA assumes responsibility for benefits, the VEBA Committee will have the authority and the responsibility to make appropriate changes to the level of benefits, member contributions and cost-sharing, and scope of coverage, as it considers necessary to maintain continued coverage based on actuarial considerations.

The "Current ACC Retiree Life Insurance Plan" as in effect on July 31, 2010, will continue unchanged on and after August 1, 2010, subject to any later changes the VEBA Committee (defined below) may make in the future to allow for continued benefits under the VEBA.

### 3. The VEBA

#### (a) Purpose, Creation, Funding, and Release of ACC

The parties agreed that a VEBA would be established and funded by ACC. As of a "New Plan Sponsor Effective Date," the VEBA would become the sponsor of the New Plan. Thereafter, the VEBA will be exclusively responsible for providing and funding the New Plan's benefits to the Class Members. The parties agreed that all assets paid or transferred by ACC to the VEBA (including any investment returns thereon) will be used for the exclusive purposes of providing "Retiree Benefits" to the participants in the New Plan and their eligible beneficiaries, defraying the reasonable expenses of administering the New Plan and for such other purposes as are set forth in the Trust Agreement. The eligibility rules for the New Plan initially will be the same as those included in the "Modified ACC Retiree Medical Plan" and the "Current ACC Retiree Life Insurance Plan" as in effect on August 1, 2010.

The VEBA will be governed by an independent committee ("the VEBA Committee") consisting of four independent members and three members appointed by the UAW.  (*See* Settlement Agreement, Doc. 23 Ex. A § 4(A); Trust Agreement, Doc. 23 Ex. A at Ex. C, § 1.5 and Article IX.)  ACC will not be involved in any way in the governance of the VEBA trust, or in the administration of the New Plan after the "Implementation Date."  Decisions by the VEBA Committee will require at least one vote from an independent member and one vote from a UAW appointed member.  (Trust Agreement, Doc. 23 Ex. A at Ex. C, § 9.9(a), pg. 25.)

Pursuant to Section 4(A) of the Settlement Agreement (Doc. 23, Ex. A § 4(A) pg. 8), a Notice of Designation of Independent VEBA Committee Members and Initial Compensation ("Notice of Designation") and a revised form of Trust Agreement ("Revised Trust Agreement") identifying the initial independent members of the VEBA Committee, their initial terms and their initial compensation, were filed with the Court prior to the September 16, 2010 hearing date. The Revised Trust Agreement designates the initial independent members of the VEBA Committee and their initial terms as follows:  Suzanne Paranjpe, expires July 1, 2011; Francine Parker, expires July 1, 2012; Gary Petroni, expires July 1, 2013; and Jack Martin, expires July 1, 2014.  (Notice of Designation pg. 2; Revised Trust Agreement, Sec. 9.2 pg. 13 and Ex. D pg. D-1.)  The Revised Trust Agreement sets the initial compensation of the independent VEBA Committee members as follows:

> Independent Members, with the exception of the Chair, shall receive an annual retainer of $10,000, payable in equal quarterly installments, and a meeting fee of $500 for each meeting of the Committee in which such Independent Member participates, provided, however, that the combination of retainer and meeting fees shall not exceed $13,000 per calendar year.  The Chair shall receive an annual retainer of $12,000, payable in equal quarterly installments, and a meeting fee of $500 for each meeting of the Committee in which the Chair participates, provided, however, that

the combination of retainer and meeting fees for the Chair shall not exceed $15,000 per calendar year.

(Notice of Designation pg. 2; Revised Trust Agreement, Sec. 9.10 pg. 16.)

ACC's financial obligation and payments to the VEBA are fixed and capped by the terms of the Settlement Agreement. ACC will fund the VEBA with a one time "Initial Payment" of $21.6 million. ACC will also make a lump sum "Second Payment" to the VEBA consisting of: (a) interest on the Initial Payment amount, from August 1, 2010 until the date of the Initial Payment; plus (b) interest on that amount in "(a)" from the date of the Initial Payment to the date of the Second Payment; plus (c) an amount equal to $300,000, in lieu of any "Medicare Part D" subsidies, temporary "Early Retiree Reinsurance Program" reinsurance (as described in the Patient Protection and Affordable Care Act) and other health care related subsidies, rebates and refunds. The Second Payment will be offset by the sum of certain "Monthly Offset Amounts" defined in Section 6(B)(ii) of the Settlement Agreement.

The payments by ACC to the VEBA are based on the parties' understanding that there are 152 retired/terminated ACC-UAW Represented Employees (or their surviving spouses) currently eligible to receive Retiree Benefits, under the terms of this settlement. In the event that a Class Member who is a retired or terminated ACC-UAW represented employee or a surviving spouse of such an individual (but not a spouse or a dependent of such individual) who is not listed on Exhibit D to the Settlement Agreement claims eligibility for Retiree Benefits from either ACC or the VEBA, ACC will pay to the VEBA a lump sum payment of $144,079, adjusted for interest for the period that begins on August 1, 2010 and ends on the date of payment of such lump sum.

In exchange, ACC will receive a broad release from any liability for providing retiree medical and life insurance benefits, as described in more detail in the Settlement Agreement, §§ 2 and 14.  The only obligations of ACC to the New Plan and the VEBA will be those set forth in the Settlement Agreement.

### (b)  Negotiation of the ACC VEBA Contribution

The parties' negotiation of the amount of ACC's VEBA contribution was intensive.  The goal of Class Counsel and the UAW was to obtain immediate cash funding of the VEBA sufficient to provide substantial medical and life insurance benefits to the Class Members for the remainder of their lifetimes.  (Prelim. Approval Br., Doc. 23 pg. 13; Prelim. Approval Op. Doc. 27 pg. 17.)  Throughout the negotiations regarding the contribution amount, Class Counsel and the UAW drew upon the expertise of their consultants and experts to determine the desired VEBA funding.  (Paranjpe Decl., Doc. 23 Ex. D; Taranto Decl., Doc. 23 Ex. E.)  Class Counsel and the UAW are satisfied that ACC's cash funding commitment is, based on the advice of UAW's actuarial expert, sufficient to satisfy those settlement objectives.  (Prelim. Approval Br., Doc. 23 pg. 13; Prelim. Approval Op. Doc. 27 pp. 17-18.)

Based on actuarial calculations, ACC's VEBA contributions described above fund 76% of the benefits under the Modified ACC Retiree Medical Plan and the Current ACC Retiree Life Insurance Plan as in effect August 1, 2010.  (*See* Taranto Decl., Doc. 23 Ex. E ¶ 9.)  This funding level means that, unless future experience is more favorable than actuarial assumptions, the VEBA Committee will have to institute benefit reductions and cost-shifting to Class Members after the New Plan Sponsor Effective Date to the extent that it cannot obtain savings through administrative and provider changes.  (Prelim. Approval Br., Doc. 23 pg. 13-14; Prelim. Approval Op. Doc. 27 pg. 18.)

Despite this, Class Counsel and the UAW believe that the security provided by an independent VEBA trust funded with immediate cash funding is far preferable than subjecting the retirees and their families to the risk of litigation, or the risk that obtaining a favorable judgment will result in a "Pyrrhic victory" if it compromises ACC's continued viability and drives ACC out of business or into bankruptcy. In this regard, it was extremely important to Class Counsel and the UAW to obtain the security of immediate cash funding in an independent VEBA trust. (*Id.*) The ACC VEBA will not be dependent on funding based on long-term notes or equity instruments of uncertain value, and the VEBA assets will not be subject to the claims of ACC's creditors in the event of ACC's insolvency. All VEBA trust assets will be used exclusively for payment and administration of benefits to the Class. (*Id.*)

### (c)    Eligibility for the VEBA

Class Members will be eligible to participate in the New Plan and the VEBA. Determinations regarding the status or eligibility of any individual Class Member under the New Plan will be solely and exclusively the responsibility of the VEBA Committee. A Class Member will be eligible for participation in the New Plan and the VEBA and to receive benefits from the VEBA trust with respect to claims incurred on and after the "New Plan Sponsor Effective Date." Participation in the New Plan may be contingent on the Class Members satisfying conditions the VEBA Committee may impose.

### (d)    Provision of Benefits During Transition

Because of the time necessary to complete the settlement approval process, to create the VEBA, and to get the VEBA "up and running" so as to provide a smooth transition in coverage for Class Members, the parties agreed that ACC would have to continue to act as the plan sponsor and administer Retiree Benefits for a period of time. Through July 31, 2010, ACC

continued, as the plan sponsor, to provide the Class Members with the "Retiree Medical Benefits" and "Retiree Life Insurance Benefits" that they currently have under the terms of the CBAs.

Beginning on August 1, 2010 and until the New Plan Sponsor Effective Date, ACC will provide the Class with Retiree Medical Benefits as set forth in the "Modified ACC Retiree Medical Plan" and will continue to provide the Class with Retiree Life Insurance Benefits at the same level and scope as provided for by the Current ACC Retiree Life Insurance Plan.

With respect to claims incurred on or after the New Plan Sponsor Effective Date, but prior to the Implementation Date, the New Plan and the VEBA will have responsibility for providing Benefits for the Class. ACC and the "Penske Entities," however, will provide transitional administrative assistance to the New Plan and the VEBA as a third-party administrator in accordance with Section 5(B) of the Settlement Agreement. This is designed to ensure no interruption in Benefits if ACC is unable to perform that function.

As of the Implementation Date, the New Plan and the VEBA will provide and administer Benefits for the Class. ACC will no longer have any obligations or responsibilities as a third-party administrator for the New Plan, and ACC will no longer participate in any manner in the administration of the New Plan and the VEBA. Accordingly, after the Implementation Date, administration of the New Plan and the VEBA will be solely the responsibility of the VEBA Committee. The VEBA Committee will have the authority to establish benefits as described in the Trust Agreement, including raising or lowering benefits, as of the New Plan Sponsor Effective Date.

ACC and the "Penske Entities" have agreed in the Settlement Agreement to cooperate fully with Class Counsel, the UAW, and the VEBA Committee, in the transition of administration of Retiree Benefits to the VEBA Committee and the New Plan.

### 4.    Costs, Expenses, and Attorneys Fees

As part of the Settlement Agreement, ACC has agreed to pay Class Counsel's reasonable, attorneys fees, expert and professional fees and expenses as approved by the Court. (Settlement Agreement, Doc. 23 Ex. A § 13.) On August 26, 2010, the Court granted Class Counsel's motion for an interim award of attorney fees and expenses for the period November 2, 2009 through July 31, 2010 (the "Interim Period"). (*See* Op. and Order Granting Mot. for Interim Attorney Fees and Expenses, Doc. 31.)

The Court found that Plaintiffs reasonably spent and adequately documented costs and expenses in the prosecution of this action for the Interim Period in the amount of $11,246.21, included in which are consultant fees for Dr. Nitin V. Paranjpe in the amount of $10,800.00, which the Court found to be reasonable and warranted. (*Id.* at ¶ 11.) The Court also found that Plaintiffs' legal fees and expenses for the Interim Period totaling $162,238.71 are reasonable, warranted, approved and allowed. (*Id.* at ¶ 12.)

Class Counsel may submit supplemental fee and expense requests for work done and expenses incurred after July 31, 2010 in connection with the settlement approval process, any further court proceedings, and the implementation of the Settlement Agreement and judgment, and the Court will address and decide any such supplemental request.

ACC has also agreed to pay the UAW's legal fees in the fixed amount of $60,000. (Settlement Agreement, Doc. 23 Ex. A § 13.B.) Further, ACC agreed to pay reasonable and

necessary expert and consultant fees and expenses incurred by Class Counsel and the UAW's Counsel. (*Id.* at § 13.) Finally, ACC agreed to pay reasonable and necessary implementation and transition expenses associated with the New Plan and the VEBA. (*Id.* at §11.)

ACC will not deduct payments it makes (i) for legal fees, costs and expenses associated with this Class Action or (ii) with regard to the reasonable and necessary costs associated with the transition of coverage for the Class to the New Plan and VEBA from its payments to fund the VEBA pursuant to Section 6 of the Settlement Agreement. Consequently, ACC's contribution to the VEBA, as set forth in the Settlement Agreement, will be used to provide benefits to the Class Members going forward and will not be consumed with implementation and transition expenses or expenses or professional fees associated with the litigation or the settlement.

ACC has agreed not to seek fees or expenses.

### E.    Class Counsel's Assessment

As set forth above, in the course of the settlement negotiations and the preparation of the documents related to the settlement, Class Counsel and the UAW engaged in an extensive review of the settlement terms as well as ACC's financial condition with the assistance and guidance of several experts. In the course of reaching the proposed settlement, Class Counsel and the UAW each assessed the impact of the proposed settlement on the Class Members, including their continuing access to medical and life insurance. Class Counsel and the UAW gave serious consideration to the documentation indicating that, even if this lawsuit is concluded in favor of Plaintiffs and the Class Members, ACC would not have sufficient assets to enable it to comply with a judgment. Class Counsel and the UAW also thoroughly investigated and analyzed the various factual and legal issues relevant to Plaintiffs' claims and ACC's claims. They

independently reviewed and analyzed the applicable CBAs, conducted their own factual investigations and thoroughly investigated and analyzed the applicable law. Class Counsel, the Plaintiffs and the UAW have all concluded that the settlement is in the best interests of the Class and all concur that the settlement terms embodied in the Settlement Agreement are fair, reasonable and adequate.

The parties filed joint motions for preliminary approval of the settlement and for final approval, and concur in the settlement. (Jt. Mot. Prelim. Approval, Doc. 23; Jt. Mot. Approval, Doc. 34.) In the briefs filed in support of those motions, and at the approval hearings, the parties identified a number of factors that led them to the conclusion that the settlement is fair, reasonable, and adequate. (*Id.*)

### F.      Defense Counsel's Assessment

ACC's counsel concurs that the settlement is fair, reasonable, and adequate and is a mutually-beneficial and positive resolution of the parties' dispute, bringing certainty, avoiding more delay, eliminating the risk of loss, and providing salutary and valuable benefits to the Class Members.

As addressed in the conclusion of law set forth below, the Court concurs with the parties and counsel and finds that the settlement is fair, reasonable and adequate under Fed. R. Civ. P. 23(e)(2).

### G.      Notice to the Class

On August 2, 2010, the Court approved the parties' form and method of class settlement notice to be (i) mailed directly to households of Class Members by ACC's counsel and (ii) published in Michigan. (*See* Prelim. Approval Br., Doc. 23 Exs. B-1 and B-2, respectively;

Prelim. Approval Op., Doc. 27 pg. 26; Prelim. Approval Order, Doc. 28 pp. 2, 4; Approved Class Notice, Doc. 29.)

The Court also found that ACC's counsel had compiled a reasonably current list of all Class Members and a list of addresses for all eligible retirees/terminated employees and the eligible surviving spouses. (*Id.*) The Court acknowledged that ACC did not have separate address information for spouses and dependents of retired/terminated employees who are eligible to receive benefits. (*Id.*) It agreed that "sending notice to the household of each eligible retiree/terminated employee and surviving spouse, together with notice in publications of general circulation in Michigan, will provide reasonable and sufficient notice to all Class Members, including eligible spouses and dependents." (Prelim. Approval Op., Doc. 27 pg. 26; Prelim. Approval Order, Doc. 28 pg. 4.)

In addition, the Court confirmed that the parties' form and method of notice set out the material terms of the proposed settlement and satisfied the due process requirements of Fed. R. Civ. P. 23(e)(1). (*Id.*) The class notice summarized the litigation, the settlement and the approval process. The notice mailed to Class Members was accompanied by a complete copy of the Settlement Agreement; the form of Trust Agreement (Ex. C); a list of retirees, terminated employees and surviving spouses included in the Class (Ex. D); and, a "Benefit Summary." (*Id.*)

The class notice outlined the purpose of the settlement, summarized the lawsuit, identified the parties and the lawyers, defined the certified class, and outlined the parties reasons for settlement, including the decisive factors favoring settlement. The notice also summarized the settlement terms, including, (i) the Modified ACC Retiree Medical Plan effective August 1, 2010; (ii) the VEBA and the New Plan; (iii) ACC's funding of the VEBA; (iv) future cost

shifting to retirees; (v) benefit administration during the transition to the VEBA; and (vi) settlement costs, expenses and attorneys fees. (*Id.*)

The class notice advised the Class Members about how they could obtain additional copies of the Settlement Agreement, exhibits to the Settlement Agreement or other information regarding the lawsuit or the proposed settlement from Class Counsel and that the Settlement Agreement could be inspected at the Court. (*Id.*)

The class notice also advised Class Members of (i) the right to file objections by September 3, 2010 and how to file any objections with the Clerk of Court and (ii) the right for those class members that file timely objections to appear at the September 16, 2010 fairness hearing, including when and where to appear. (*Id.*)

On August 3, 2010, ACC's counsel mailed the court approved notice package to each Class Member at his/her household. (Decl. Re Notices, Doc. 34 Ex. A ¶ 5, Ex. A.) Although the Court only required that ACC send a single notice to each household, out of an abundance of caution, ACC's counsel mailed a separate notice package to each Class Member even where more than one Class Member was listed with the same address. (*Id.* at ¶ 6.)

The United States Post Office returned five of the notice packages that were mailed by ACC's counsel indicating that the returned notice packages were not deliverable as addressed. (*Id.* at ¶ 8.) ACC and ACC's counsel checked the names and addresses that were used for each of the five returned notice packages against ACC's records, consulted additional directory assistance resources and were able to obtain corrected information for three of the five returned notice packages. (*Id.* at ¶¶ 9-10.) Those notice packages were remailed by ACC's counsel without further returns. (*Id.*)

With respect to the two additional returned notice packages, additional directory assistance resources reflected the same name and address information that ACC's counsel had used to mail the original packages. (*Id.* at ¶ 11.) One of those two Class Members is a dependent of another Class Member and was listed with the same address and household information as that Class Member and another dependent of that Class Member. (*Id.* at ¶ 12.) Consequently, two additional notice packages were sent to the same household as the returned notice package for that Class Member and those packages were not returned. (*Id.*) ACC and its counsel were unable to obtain any additional address information in connection with the only other returned notice package. (*Id.* at ¶ 13.) However, the address information that ACC and its counsel have for that Class Member identifies the Class Member as residing in Michigan, where notice was also provided by publication. (*Id.*)

On August 4, 2010, ACC's counsel caused the approved form of notification by publication to run in the Detroit News and the Detroit Free Press. (*Id.* at ¶ 14 and Ex. B.)

## H.    CAFA Notice

On July 19, 2010, ACC's counsel served upon the Attorney General for the United States and the State Attorneys General in each of the seven states where Class Members reside, by United States Certified Mail and Federal Express, notice pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1711, *et. seq.* ("CAFA"). (*See* Decl. Re Notices, Ex. A ¶¶ 15-17 and Ex. C.) Each CAFA notice consisted of a letter and an enclosed CD with documents and information satisfying the requirements of CAFA § 1715(b). (*Id.*)

## I.    Federal R. Civ. P. 23(e)(2) Statement

The parties have notified the Court that, other than as stated in the Settlement Agreement (Doc. 23, Ex. A) and the form of Trust Agreement (attached as Exhibit C to the Settlement Agreement) and discussed in the Preliminary Approval Brief (Doc. 23), there are no agreements requiring disclosure that were "made in connection with the proposal." (*See* Prelim. Approval Br., Doc. 23 pg. 17 (Federal R. Civ. P. 23(e)(2) Statement).)

### J.     Objections and the Approval Process

Only two of the three hundred twenty-four Class Members filed objections to the settlement. Their objections emanated from a belief that ACC should "honor" and "be held to" the retiree benefits set forth in the collective bargaining agreements between ACC and the UAW. (*See* Crandell and Shook Objections, Doc. 34 Exs. B and C, respectively.) One of the objectors further complained that he "never saw this coming," that "Penske-ACC" should be responsible for increased costs, and that he was uncertain about who would "handle" the money in the VEBA. (Crandell Objections, Doc. 34 Ex. B.) These limited objections essentially could apply to almost *any* settlement.

Class Counsel responded to the two objectors with letters addressing their objections and explaining why the settlement remained in the best interest of the class. (*See* Letters Responding to Objections of Crandell and Shook, Doc. 34 Exs. D and E, respectively). The letters noted that, while reaching a favorable conclusion for the Class Members through litigation might be a goal of the Class Action, doing so is not a certainty. (*Id.*) Further, Class Counsel explained that ACC's uncertain financial future provided a compelling reason to reach settlement now, with money that will fund a VEBA devoted exclusively to providing benefits to the class. (*Id.*) In other words, even if Plaintiffs were to prevail through litigation, the victory may well prompt ACC to enter into bankruptcy and leave the retirees, surviving spouses, and eligible dependents

with nothing. (*Id.*) In addition, Class Counsel addressed the objector's uncertainty about "who is going to handle" the VEBA money by explaining that the money will be controlled by the VEBA Committee, an independent body which will continually monitor variables like medical costs and investment return and make adjustments to allow benefits to continue for their intended duration. (*Id.*)

The two objections will be addressed in more detail in the conclusions of law set forth below. They provide no substantive reason to reject the settlement. Moreover, they certainly do not move the settlement outside the "range of reasonableness" in which a court should assess the settlement.

In accordance with the Court's June 21, 2010 Order Setting Dates (Doc. 19), the parties filed a Joint Motion For Approval of Class Settlement on September 10, 2010. (Doc. 34.)

The Court held a fairness hearing on September 16, 2010.

As discussed next, the Court concludes that the parties' settlement, concurred in by counsel for both sides, is the product of reasoned, informed "arm's length" negotiations, which produced a mutually-beneficial settlement that eliminates risk, ends uncertainty, avoids further delay and is consistent with the public interest, and, in all these circumstances, is fair, reasonable, and adequate under Rule 23(e)(2).

## II.    CONCLUSIONS OF LAW

The Court has jurisdiction under LMRA Section 301, 29 U.S.C. § 185, and ERISA Sections 502(a)(1)(B), 502(a)(3), 502(e) and 502(f), 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(3), 1132(e) and 1132(f). The Court also has jurisdiction of the dispute referenced in the Third-Party

Complaint pursuant to 28 U.S.C. §§ 1331 and 1367(a), based on Section 301 of the Labor Management Relations Act, 28 U.S.C. § 185.

This is a certified class action under Fed. R. Civ. P. 23(a) and (b)(1) and (2) and (g) as decided by the Court on August 2, 2010 in its Order and Opinion Granting Plaintiffs' Unopposed Motion for Class Certification and Appointment of Class Counsel and the Parties' Joint Motion for Preliminary Approval of Class Action Settlement Agreement and Proposed Class Notice. (Docs. 27 and 28, respectively.)

### A.    The Legal Standards

The law and federal policy strongly favor the settlement of class action litigation. *UAW v. General Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007) (noting "the federal policy favoring settlement of class actions"); *IUE-CWA v. General Motors Corp.*, 238 F.R.D. 583, 593 (E.D. Mich. 2006) (noting "the general federal policy favoring the settlement of class actions"); *Steiner v. Fruehauf Corp.*, 121 F.R.D. 304, 305 (E.D. Mich. 1988) *aff'd sub nom Priddy v. Edelman*, 883 F.2d 438, 447 (6th Cir. 1989) ("case law favors the voluntary settlement of class actions"). *See, e.g., Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am.,* 803 F.2d 878, 880 (6th Cir. 1986) (*per curiam*), *cert. denied* 480 U.S. 934 (1987); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003) *appeal dismissed* 391 F.3d 812 (6th Cir. 2004), *cert. denied* 544 U.S. 1049 (2005).

"The claims, issues, or defenses of a certified class may be settled … only with the court's approval." Fed. R. Civ. P. 23(e).

To warrant district court approval, a class action settlement must be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *UAW*, 497 F.3d at 631 ("Before approving a settlement, the

district court must conclude that it is 'fair, reasonable, and adequate.'"); *Cardizem*, 218 F.R.D. at 522 ("In deciding whether to grant final approval of the Proposed Settlement, this Court must determine, after holding a fairness hearing, whether the settlement is 'fair, adequate and reasonable'").

"The evaluation and approval of a class settlement is committed to the sound discretion of the district court." *IUE-CWA*, 238 F.R.D. at 594 (citing *inter alia*, *Clark Equip. Co.*, 803 F.2d at 880). The district court "should approve a class settlement if, following a hearing, the court determines that the settlement 'is fair, reasonable, and adequate.'" *IUE-CWA*, 238 F.R.D. at 593.

"Given that class settlements are favored, the role of the district court is 'limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement taken as a whole, is fair, reasonable and adequate to all concerned.'" *IUE-CWA*, 238 F.R.D. at 594 (citations omitted); *Clark* Equip. *Co.*, 803 F.3d at 880 (same).

The district court is to assess the settlement with regard to a "range of reasonableness," which "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs inherent in taking any litigation to completion." *IUE-CWA*, 238 F.R.D. at 594 (citations omitted). The district court is to consider "whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." *Cardizem*, 218 F.R.D. at 522. In assessing a proposed settlement, the district court judge "may not 'substitute his or her judgment for that of the litigants and their counsel'" and "should approve a class settlement if, following a hearing, the court determines that the settlement 'is fair, reasonable, and adequate.'" *IUE-CWA*, 238 F.R.D. at 593, 594 (citations omitted).

Before conducting a final fairness hearing, the district court must "direct notice in a reasonable manner to all class members who would be bound" by the settlement. Fed. R. Civ. P. 23(e)(1). The notice should be "reasonably calculated, under all the circumstances, to apprise [the Class Members] of the pendency of the action and afford them an opportunity to present their objections." *UAW*, 497 F.3d at 631 (citing, *inter alia*, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

The Court finds that the method, form and content of the class notice by mail and publication approved by the Court on August 2, 2010 (Doc. 23, Ex. B-1 and B-2; Doc. 27; Doc. 28; Doc. 29) -- mailed to the Class Members by ACC's counsel by first class U.S. Mail on August 3, 2010 and published in the Detroit News and Detroit Free Press on August 4, 2010 -- satisfied Rule 23(e)(1) notice requirements.

In particular, the notice explained the settlement in detail, clearly advised Class Members that future retiree medical and life insurance benefits would be provided only by or through the VEBA, clearly informed the Class Members of their rights, set out the relevant objection procedures and deadlines, provided a mechanism for class members to seek further information, and was accompanied by the salient source documents – the Settlement Agreement and the Trust Agreement, as well as a "Summary of Benefits." *See UAW*, 497 F.3d at 630 (upholding notice which "clearly explained its purpose, discussed the nature of the pending suit and proposed class and accurately summarized the 76-page settlement agreement" and which also enclosed a "copy of the settlement agreement, ensuring that retirees would have full access to the very document the district court would examine at the fairness hearing").

The purpose of the fairness hearing is to provide "procedural safeguards" giving the class members the opportunity to present objections on the record and giving the parties the opportunity to present "sufficient evidence to allow the district court to review the terms and legitimacy of the settlement." *Id.* at 635. "In satisfying these requirement, a district court has wide latitude." *Id.* The court may "limit the fairness hearing to whatever is necessary to aid it in reaching an informed, just and reasoned decision." *Id.* (citations omitted). The fairness hearing need not "entail the entire panoply of protections afforded by full-blown trial on the merits." Rather, the district court has "the discretion to limit the fairness hearing" to whatever is "consistent with the ultimate goal of determining whether the proposed settlement is fair, adequate and reasonable." *Tennessee Assoc. of HMOs, Inc. v. Grier*, 262 F.3d 559, 567 (6th Cir. 2001).

The Sixth Circuit has identified seven "factors" that "guide the inquiry" undertaken by the district court: "(1) the risk of fraud or collusion [i.e. whether the settlement is the product of arm's length negotiations as opposed to collusive bargaining]; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *Moulton v. United States Steel Corp.*, 581 F.3d 344, 349 (6th Cir. 2009); *UAW*, 497 F.3d at 631 (citing *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) and *Williams v. Vukovich*, 720 F.2d 909, 922-923 (6th Cir. 1983)); *IUE-CWA*, 238 F.R.D. at 594 (also including as a factor "whether the settlement is fair to the unnamed class members"); *Cardizem*, 218 F.R.D. at 522. The district court is to address "whether the interests for the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." *Cardizem*, 218 F.R.D. at 522 (citation

omitted). In considering the seven factors, the district court may choose to "consider only factors that are relevant to the settlement and may weigh particular factors according to the demands of the case." *IUE-CWA*, 238 F.R.D. at 594-595 (citing, *inter alia*, *Granada*, 962 F.2d at 1205-1206).

## B.     The Legal Standards Applied

Here, considering the parties' vigorously-contested legal and factual disputes, the risks, uncertainties, hardships, and delays inherent in continued litigation, and the substantial settlement amount and its salutary and beneficial impact, the settlement terms clearly fall within the range, of fairness, reasonableness and adequacy contemplated by Rule 23(e)(2).

### 1.     Assessing the dispute and weighing continued litigation against settlement.

The fairness of a class action settlement "turns in large part on the bona fides of the parties' legal dispute." *UAW*, 497 F.3d at 631. In assessing the parties' legal dispute, the district court's task "is not to decide whether one side is right or even whether one side has a better of these arguments…. The question rather is whether the parties are using settlement to resolve a legitimate legal and factual dispute." *Id.* at 632 (finding a legitimate dispute over whether "collective bargaining agreements vest former union workers with their healthcare benefits upon retirement"). *Id.* at 631.

In assessing the parties' dispute and weighing the likelihood of Plaintiffs' success on the merits if the litigation continues against the benefits to Plaintiffs of the settlement, the ultimate question for the district court is only whether the interests of the Class as a whole are better served if the litigation is resolved by settlement rather that pursued. *IUE-CWA*, 238 F.R.D. at 595 (citing, *inter alia*, *Cardizem*, 218 F.R.D. at 522). It is neither required nor is it possible for a

district court to determine that the proposed settlement is the fairest possible resolution of the claims of every individual class member; rather, the court need only determine whether the settlement taken as a whole, is fair, adequate and reasonable. *Id.* (citing, *inter alia*, *Clark Equip.*, 803 F.2d at 878). Although assessing this factor requires some evaluation of the merits of the dispute, the district court need not resolve the dispute and must refrain from reaching conclusions on issues which have not been fully litigated. *Id.* (citation omitted).

Consideration of this factor leads to the conclusion that there is indeed a legitimate dispute and that resolution of this lawsuit by the settlement better serves the Class than continued litigation.

Plaintiffs and the UAW believe that the retiree medical and life insurance benefits at issue are vested and may not be modified unilaterally as ACC seeks to do. ACC disputes that the benefits are vested, asserting that it has the clear right to modify the benefits. All parties, though confident in their legal positions, recognize the uncertainties of litigation, and the prospect of "a long, arduous [trial] requiring great expenditures of time and money on behalf of both the parties and the court" weighs in favor of settlement. *In re Cincinnati Policing*, 209 F.R.D. 395, 400 (S.D. Ohio 2020) (internal quotation marks and citation omitted).

Reviewing the terms of the Settlement Agreement, it provides all sides with beneficial certainty and prompt resolution. Moreover, the settlement terms are the product of an informed and reasoned process in which all sides vigorously pressed their interests and, ultimately, developed a mutually-beneficial compromise. The decisive factors in favor of settlement include: (1) ACC's commercial and financial position, and specifically its short and long term ability to continue paying for retiree medical and life insurance benefits; and (2) that, under the

proposed settlement, the retirees will be protected from that risk by immediate and substantial cash funding of an independent VEBA trust.

Class Counsel and the UAW have carefully considered the prospect that, regardless of the legal strength of Plaintiffs' claims, a successful outcome will do little good for the Class if ACC is financially unable to comply with a judgment for the Class. Based on their review of the information provided by ACC, and on the examination and conclusions of their experts, Class Counsel and the UAW are convinced that ACC can exert little to no market leverage to induce GM to continue the Labor Subsidy and that without the Labor Subsidy or any available replacement, ACC will not continue as a financially viable entity without a restructuring and reduction of its retiree benefit obligations. Balanced against that, Class Counsel and the UAW believe the proposed settlement will provide secure funding and thereby protect the retirees' benefits.

The Settlement Agreement provides coverage for all eligible Class Members. The immediate VEBA cash funding alleviates the risk that would result if continuation of the Class Members' retiree medical and life insurance benefits were to remain dependent on ACC's financial fortunes over the short or the long term. Under the proposed settlement, the money to provide benefits in the future will be placed in the VEBA trust now, protected from the claims of ACC or its creditors, where it will be administered for the exclusive benefit of the Class Members.

Recent litigation addressing similar disputes ended in resolutions similar to the settlement reached by the parties here, reflecting the judgment of district courts and similarly-situated litigants that reasonable compromise is preferable to the risks and other detriments of sharply-

contested litigation. Those resolutions, providing for the formation and funding of VEBAs to continue contested retiree benefits, were approved by courts as appropriate settlements of similar high stakes class action lawsuits over whether retiree benefits were vested. *See, e.g.*, *UAW*, 497 F.3d at 632 (findings of fact and conclusions of law approving class action settlement providing for the VEBA to resolve retiree healthcare benefits litigation); *IUE-CWA*, 238 F.R.D at 582 (same); *UAW v. Chrysler LLC*, 2008 WL 2980046 (E.D. Mich., July 31, 2008) (same); *UAW v. General Motors Corp.*, 2008 WL 2968408 (E.D. Mich., July 31, 2008) (same); and *UAW v. Ford Motor Co.*, 2008 WL 4104329 (E.D. Mich., August 29, 2008) (same).

The Court need not and should not decide the merits of the case or resolve the unsettled legal questions it presents. *IUE-CWA*, 238 F.R.D. at 595. It is sufficient to warrant approval of the settlement to determine that the Settlement Agreement is a rational and salutary resolution of contested, uncertain, protracted, and risky litigation. The Court concludes that such is the case here.

The Court finds that the parties' dispute is genuine, that the outcome of continued litigation is uncertain, that continued litigation would carry substantial risks for both sides, and that, in particular, Class Members would bear the risk that continued litigation will leave them with nothing. Under these circumstances, the Court finds in favor of a settlement that ends uncertainty, avoids further delay, eliminates risk, promptly ameliorates hardship, and provides significant benefit to each side and the class as a whole.

## 2.    The risk/delay/expense factor

Whatever the relative merits of the parties' legal positions, there is no risk-free, expense-free litigation. *IUE-CWA*, 238 F.R.D. at 596. In *IUE-CWA,* Judge Hood noted the protracted

litigation in two retiree health benefits cases finally decided by the Sixth Circuit – *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1999), which after nine years of litigation upheld the employer's right to modify salaried retirees' benefits, and *Bittinger v. Tecumseh Products*, 201 F.3d 440 (6th Cir. 1999), which after eight years of litigation affirmed the employer's right to modify retire health benefits. *See also UAW v. General Motors*, 2006 WL 891151 at *17 (E.D. Mich.) ("The obvious costs and uncertainty of such lengthy and complex litigation weigh in favor of settlement) consl. and aff'd. *UAW v. General Motors*, 497 F.3d 615 (6th Cir. 2007); *In re Cincinnati Policing*, 209 F.R.D. 395, 400 (S.D. Ohio 2002) ("the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court…. The prospect of such a massive undertaking clearly counsels in favor of settlement.") (internal quotation marks and citations omitted).

Here, all the parties agree that there is a substantial risk that ACC will not be financially capable of continuing to provide benefits were litigation to continue and even if litigation ultimately resulted in a judgment on the merits in favor of the Class Members. Absent settlement, all Class Members would be subject to the uncertainty, risk, hardship and delay attendant to continued litigation, which ultimately might leave them with absolutely nothing.

Accordingly, the "risk/delay" factor warrants approval of the settlement, which will provide prompt support for continued retiree medical and life insurance benefits for all Class Members.

### 3. The judgment of counsel

The judgment of Class Counsel that the settlement is in the best interest of the Class "is entitled to significant weight, and supports the fairness of the class settlement." *IUE-CWA*, 238

F.R.D. at 597. *See also Cardizem*, 218 F.R.D. at 525 ("in approving a proposed settlement, the court also considers the opinion of experienced counsel as to the merits of the settlement.")

The UAW has a long history of negotiating on behalf of ACC employees and is well positioned to analyze the parties' rights under the various collective bargaining agreements and plan documents. Class Counsel and the UAW are both experienced in this type of litigation and have extensive experience with VEBAs. (*See* Mot. to Cert. Class, Doc. 22 and Exhibits; Op. Granting Mot. to Cert. Class, Doc. 27 pp. 6-7.) Their efforts and analysis in the settlement process, already summarized, displayed an informed, reasoned and practical approach to the litigation and the settlement process. Their universal assessment that the settlement is in the interest of all parties and is fair, reasonable, and adequate is well-supported and is consistent with the Court's views. The Court recognizes their experience and diligence and concludes that their endorsement of the settlement "is entitled to significant weight." *IUE*-CWA, 238 F.R.D. at 597 ("the Court must rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel.'") (citations omitted).

Accordingly, the Court finds that the judgment of counsel factor warrants approval of the settlement.

### 4. The discovery/evidence factor

As discussed above, ACC has provided Class Counsel and the UAW with extensive information regarding its current and projected future financial and business performance, and its retiree medical and insurance benefits, which the parties discussed in detail. (*See* Ott Decl., Doc. 23 Ex. C ¶¶ 10-11; Paranjpe Decl., Doc. 23 Ex. D ¶ 5.) ACC's disclosures included documentation of ACC's financial performance over a period of years, its dependence on GM

for its revenues, and the nature of ACC's market. With the assistance of their expert consultants, Class Counsel and the UAW have reviewed and analyzed the governing documents, the information provided by ACC and the relevant law. The Court finds that through a cooperative information exchange[3] the parties developed a body of documents and information (i) sufficient to permit their informed assessment of the litigation and settlement, (ii) sufficient to inform the Court that their dispute is genuine and based on good-faith, albeit diametrically-opposed, legal positions, and (iii) sufficient to support the conclusion that the settlement is reasonable and desirable from all perspectives.

The Court concludes that the parties and the Court have sufficient information to conclude that the settlement is a fair, reasonable, and adequate resolution of the parties' dispute. Accordingly, the evidence factor, too, warrants approval of the settlement under Rule 23(e)(2).

### 5. Fairness to Unnamed Class Members/Arm's-Length Negotiations factors

District courts may scrutinize settlements to ensure that absent class members have not "lost out in favor of attorneys and named class members." *IUE-CWA*, 238 F.R.D. at 598 (citations omitted). Nevertheless, the courts presume the absence of fraud or collusion in class action settlements unless there is evidence to the contrary. *Id.*; *Granada Inv.*, 962 F.2d at 1205 ("Absent evidence of fraud or collusion, such settlements are not to be trifled with.").

---

[3]     In this regard, courts do not require formal discovery so long as the parties have adequate information in order to evaluate the relative positions. *See Newby v. Enron Corp.*, 394 F.3d 296, 306 (5th Cir. 2004) ("Formal discovery [is not] a necessary ticket to the bargaining table") (citation and quotation omitted); *Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977) ("Being an extra judicial process, informality in the discovery of information is desired"); 4 *Newberg* § 11:45.

Here, there is no suggestion of fraud or collusion and there is nothing in the parties' Settlement Agreement that improperly benefits attorneys or favors the class representatives.

The negotiations were conducted at arm's-length by adversarial parties and experienced counsel and there are no obvious deficiencies or inequities. Accordingly, the presumption of good faith is amply supported.

Specifically, the UAW and ACC began discussing the Retiree Benefits over a year ago. Shortly after this action was filed, Class Counsel joined the discussions between ACC and the UAW. It was only after another seven months of additional marathon, hard-fought discussions and negotiations that the parties were able to forge a compromise.

The even-handed treatment of Class Members and the absence of any special or inappropriate treatment of class representatives and Class Counsel in the Settlement Agreement also demonstrate the absence of collusion. *IUE*-CWA, 238 F.R.D. at 599. Here, the Class is cohesive and relatively homogeneous, and the Settlement Agreement therefore affects similarly-situated Class Members in the same fashion. Because all Class Members share the same interests in obtaining the best possible benefits for retirees, there is no risk of unequal treatment of absent Class Members or preference to Plaintiffs as the class representatives. Moreover, the named class representatives are given no special consideration or advantage under the Settlement Agreement. Rather, the Plaintiffs will receive exactly the same benefits as other similarly-situated Class Members; they will receive nothing extra or different on account of their service as class representatives. *See, e.g., Heit v. Van Ochten*, 126 F. Supp. 2d 487, 490-491 (W.D. Mich. 2001) (rejecting suggestion of collusion and noting absence of preferential treatment of named class members).

In addition, the Settlement Agreement does not provide for excessive compensation for the attorneys. The agreement provides that Class Counsel may apply to the Court for reimbursement by ACC of reasonable attorneys fees, based upon the hours actually worked and a reasonable hourly rate, with no upward adjustments (such as any lodestar multipliers, risk enhancements, success fee, completion bonus or rate premiums). (*See* Settlement Agreement, Doc. 23 Ex. A, § 13.) The compensation is reasonable on its face, particularly given that the reasonableness of compensation is ultimately in the control of the Court and will not decrease the fund or benefits available to the Class Members.

Finally, courts recognize that the best indicator of good faith negotiations is the fairness of the terms of the settlement itself. *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 152 (S.D. Ohio 1992) (citation omitted); *IUE-CWA*, 238 F.R.D. at 599 ("The authorities hold that if the settlement agreement itself is fair, reasonable and adequate, then the court may assume that the negotiations were proper and free of collusion."). As noted, the Court concludes that the terms of the Settlement Agreement are fair, reasonable, and adequate and, therefore, the Court concludes that the settlement negotiations were, as the parties attest and as all the circumstances indicate, conducted at "arm's length," properly and free of collusion.

Because the treatment of the Class Members, the class representatives and Class Counsel under the Settlement Agreement is fair, reasonable, and adequate, and because there is no evidence of fraud or collusion, the "fairness" and "arms length" factors also support approval of the settlement.

### 6.	The public interest factor

The resolution of this litigation will, among other things, (i) provide retiree medical and life insurance benefits, (ii) ensure certainty for all concerned without more delay, and (iii) will obviate the need for years of litigation, all of which are consistent with the public interest. Accordingly, it simultaneously benefits the parties and serves the public interest by ensuring the availability of medical benefits and resolving this federal court dispute with the maximum possible expediency and efficiency. *See Cardizem*, 218 F.R.D. at 520 ("There is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources").

Accordingly, the "public interest" factor favors approval of the settlement.

### 7. The reactions/objections of absent Class Members factor

As discussed, all of the factors identified by the Sixth Circuit as relevant to district court assessments of proposed settlements of class action litigation support the conclusion that the parties' Settlement Agreement is fair, reasonable, and adequate under Rule 23(e)(2). The objections filed by two Class Members do not alter this conclusion.

Only two of the three hundred twenty-four Class Members filed objections to the settlement. Their objections emanated from a belief that ACC should "honor" and "be held to" the retiree benefits set forth in the collective bargaining agreements between ACC and the UAW. (*See* Crandell and Shook Objections, Doc. 34 Exs. B and C, respectively.) One of the objectors further complained that he "never saw this coming," that "Penske-ACC" should be responsible for increased costs, and that he was uncertain about who would "handle" the money in the VEBA. (Crandell Objections, Doc. 34 Ex. B.) These limited objections, focusing primarily on

personal considerations, essentially could apply to almost *any* settlement, and do not justify rejection of the settlement.

Viewed for their substance, the objections are understandable but misplaced. As Class Counsel explained to the objectors (*See* Letters Responding To Objections Of Crandell and Shook, Doc. 34 Exs. D and E, respectively), litigating to a favorable conclusion might be a goal of the class action, but it is not a certainty. Further, ACC's uncertain financial future is a compelling reason to reach settlement now while there is money available to fund a VEBA that will be devoted exclusively to providing benefits to the class. (*Id.*) In addition, the objector's uncertainty about "who is going to handle" the VEBA money is easily addressed. The settlement funds will be controlled by the VEBA Committee, an independent body which will continually monitor variables like medical costs and investment return and make adjustments to allow benefits to continue for their intended duration.

Further, the scarcity of objections -- relative to the number of class members overall -- indicates broad support for the settlement among Class Members. *IUE-CWA*, 238 F.R.D. at 600 (explaining that "a relatively small number of class members who object is an indication of a settlement's fairness," and that "minimal opposition suggests that the class as a whole is in favor of the agreements"); *In re Cardizem*, 218 F.R.D. at 527 (explaining that a small number of objections is "indicative of the adequacy of the settlement").

The two objections that were submitted provide no substantive reason to reject the settlement. Moreover, they certainly do not move the settlement outside the "range of reasonableness" in which a court should assess the settlement while recognizing "the

uncertainties of law and fact in any particular case and the concomitant risks and costs inherent in taking any litigation to completion." *IUE-CWA*, 238 F.R.D. at 594 (citations omitted).

In sum, these limited objections do not alter the conclusion that the settlement rationally resolves a genuine legal dispute, provides significant benefits to the Class Members, eliminates risks, avoids further delay, reflects the parties' informed judgment as to the risks and likely benefits of litigation, was the product of informed "arm's length" negotiations, conserves judicial resources and is consistent with the public interests. Accordingly, the Court finds that the settlement is fair, reasonable, and adequate under Rule 23(e)(2).

ACC's payments to the VEBA and of costs and fees pursuant to the Settlement Agreement to comply with the requirements of, Section 302(c)(2) of the Labor-Management Relations Act, 29 U.S.C. § 186(c)(2). *See U.S. v. Mabry*, 518 F.3d 442, 447 (6th Cir. 2008).

## III.    CONCLUSION

For these reasons, the Court finds that, considering all circumstances, the Settlement Agreement is fair, reasonable, and adequate under Rule 23(e)(2). Accordingly, the parties' joint motion for approval of class action settlement is GRANTED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: October 18, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 18, 2010, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager